# UMEKICHI NAKA *vs.* THE AMERICAN SHIP WM. H. SMITH.

## May 24, 1906.

*Safe place to work and passage thereto—Duty of ship toward those engaged to work on board:*  It is the duty of a ship to provide a safe place to work and a safe passage thereto for those engaged to perform work on board.

*Same—While in the hands of stevedores:*  Ship not required to keep up such safe condition while in the hands of stevedores.

*Assumption of risks by stevedores—Regular hatches:*  Stevedores presumed to know that the regular hatches are usually kept open while a ship is in port; and this custom creates one of the risks which they assume in engaging to work on board of such vessels.

*Same—Trimming hatches:*  The foregoing rule does not apply to trimming hatches, which are without coamings and are usually situated away from the middle line of the vessel.

*Same—Risks caused by employer's negligence:*  Risks arising out of the negligence of the master are not those ordinarily incident to the employment and are not, therefore, assumed by the servant (*Bunker Hill etc. Co. v. Jones,* 130 Fed. Rep. 813, 818-819), unless the servant becomes cognizant of them and continues his service without objection (*Chocktaw etc. R. R. Co. v. McDade,* 191 U. S. 64, 68).

*Ship's liability for master's negligence:*  A ship is liable for negligence to a stevedore where such stevedore was engaged with others to go aboard and trim ballast, and a trimming hatch in the between deck in a dimly lighted passage-way from the point of ingress at the fore hatch toward the place where the work was to be done, was left uncovered by the master, and the stevedore in proceeding to the place of work fell into the same receiving injuries.

*Contributory negligence:*  A stevedore who has within a short time worked on board a ship and become acquainted with the location of certain trimming hatches, who goes aboard in the employment of a stevedore firm to trim ballast, and hastens into and along a dim passage way between deck leading to the place where the work is to be done, without waiting for instructions from his foreman and without waiting for his eyes to become used to the dimness, and falls through one of such trimming hatches in such passage, receiving injuries, is guilty of contributory negligence.

*Damages for injuries resulting from master's negligence as affected by contributory negligence of libelant:*  Damages assessed against a ship for injuries mainly resulting from negligence of the master and partly from contributory negligence on the part of the libelant, diminished one-third.

*In Admiralty*:  Libel *in rem* for damages for personal injuries.

*J. J. Dunne* and *E. A. Douthilt,* Proctors for Libelant.
*A. G. M. Robertson,* Proctor for Libellee.

DOLE, J.   The undisputed facts shown by the pleadings and evidence in this case are substantially as follows:

Libelant was a stevedore working under an employer who was under an engagement with the ship.   The first work upon which these men were employed was discharging coal from the lower hold.   The ship was constructed with two decks.   This coal was laden in the lower hold and partly on the lower deck. The lower deck contained beside the regular hatches, which were three in number, small apertures between the middle line of the ship and the side, a little nearer to the middle line than the side, known as trimming hatches.   These were holes about three feet square without coamings, and so arranged that when closed the covering was flush with the deck.   These were open when the coal was being discharged.   Afterwards the libelant with other stevedores was engaged with his employer in loading ballast on to the vessel and in this work they were located upon the wharf filling tubs with ballast which were hoisted on board by a donkey engine and discharged into the main and after hatches, finishing on a Saturday afternoon.   On Monday morning, upon reporting at the office, they were told there was no work for that day, but soon after they were engaged to stow the ballast which had been taken on board, and went to the ship in the morning, reaching there about seven o'clock.   During the interval between finishing work on Saturday and beginning work on Monday, the vessel had been moved into the harbor and anchored there preparatory to being put in order for the voyage, by having the ballast stowed and fumigation performed.   Upon going aboard, under the instructions of someone on board who appeared to have authority, the libelant started down the fore hatch to the lower deck and proceeding along the lower deck toward the main hatch, fell through one

of the said trimming hatches which was open, receiving injuries which caused a fracture of his left thigh for which damage this suit was brought claiming damages of $10,000 on a charge of negligence against the ship.

The issue in the case is the question whether the ship was negligent in leaving the trimming hatch uncovered and failing to notify the libelant of such fact and in not lighting the passage-way from the fore hatch along the lower deck to the main hatch; also a question of fact as to the condition of such passage-way in relation to the amount of light there at the time of the accident, the witnesses for the libelant generally testifying that it was quite dark, so much so that the trimming hatch in question was not visible from the foot of the ladder from the fore hatch to the 'tween deck, the witnesses of the libellee testifying to a greater degree of light. The testimony of all the witnesses on this point, except that of Edward Jenett, substantially agrees that the passage-way was so dark that one had to wait at the bottom of the ladder before going on until his eyes became accustomed to the darkness. There is no evidence that the passage-way was artificially lighted. Under such conditions anyone going down into the between decks and immediately passing along would be likely to step into the trimming hatch from inability to see it.

The libellee contends that inasmuch as the libelant with his associates was at work in the vessel some days beforehand discharging coal and knowing about these trimming hatches, and the evidence showing that they were open at such time, the coal extending up through them, that libelant was duly informed of the locality of such hatch so that his accident was due to his own negligence. This would probably be the case under the authorities, if the accident had happened during the continuation of the work of the stevedores in the ship, as under such circumstances the condition of the hatch would have been directly due to their own acts and the libelant would have been sufficiently informed upon being present the day before of its probable condition as to being open the day after, but as libel-

ant and his associates after the work of discharging coal, were engaged in loading ballast on the ship doing their work on the wharf, filling tubs with ballast which were hoisted on board, and, for a time, in doing stevedore work on another ship, the whole occupying Thursday, Friday and Saturday, during which time they did not go on board of the libellee, and two days afterward were re-employed to stow the ballast which had been taken on board the libellee, the contention of the libellee loses its force, because in the interim the ship was in the possession and control of the master and crew and the condition of the hatch on the morning of the accident was not due to libelant and his associates nor was the libelant informed by anyone belonging to the ship, that it was uncovered on that morning.

It is an established rule that a "vessel complies with its full duty to the stevedores when it has furnished a reasonably safe place in which to work, and an unobstructed passage thereto, suitably lighted." *The Saranac,* 132 Fed. Rep. 936; *Fitzgerald v. Conn. R. P. Co.,* 155 Mass. 155, 157.

The case of *The Gladiolus,* 21 Fed. Rep. 417, cited by libellee's counsel, illustrates this point. The ship employed a stevedore firm to prepare the ship for cargo and to stow cargo. The firm put a gang on board who cleared away coal from a certain part of the ship. The next day the firm put a different gang aboard to load and one of them went through an open sliding door between decks and stepped into an open hatch. The hatches and doors were as they were left by the stevedore gang of the day before, which was the same condition in which the first gang found them. The ship being under the control of the stevedore firm the day before the accident, the negligence, if any, was its negligence and not that of the ship, the implication being that if such accident had happened at the beginning of the work by the stevedores with the conditions as left by the ship, the ship would have been liable, except that the court decided that the injured man was himself negligent in entering between decks, where an open hatch was, without a

light if a light was necessary. In other words, the ship was bound to be delivered to the stevedores in a safe condition for the work assigned them, with safe passage to such work, but the ship was not responsible for keeping up such condition while the ship was in the hands of the stevedores. As to the negligence of the libelant in that case, the circumstances were different from those applying to this case. The hatch through which he fell was a common between deck hatch-way which is usually left open while a vessel is lying in port, such practice being known to sailors and to men doing stevedore work, or at any rate, they have full opportunity of knowing of such custom. Under those circumstances it was not presumptive evidence of negligence on the part of the ship.

This reference to the distinction between an ordinary hatch and a hatch described as a trimming hatch in this case, has been largely commented on by the courts and the rule has been established that there is no negligence on the part of the ship in leaving its regular hatches open while the ship is in port, and that all accustomed to work on the ship are presumed to know of this custom. A number of authorities cited by the libellee apply to such circumstances, that is to accidents happening by men falling into the regular hatches, and I do not consider that those cases apply to this case, the customary uncovered condition of such hatches being one of the risks that one engaged to work on board as a stevedore assumes.

Another point in relation to this attitude of the courts is the fact that regular hatches are all provided with coamings which consist of raised planking around the edge of the hatch, which in darkness furnish some warning to persons working around them, whereas a trimming hatch has no raised edge whatever.

The case of *The Guillermo,* 26 Fed. Rep. 921, 922, appears to apply to the present case.

" The libelant went upon the ship lawfully and in discharge of his duties. The open hatch was not in the situation of the ordinary open hatches for a discharge of cargo, such as may be expected to remain open in port, and which persons going upon

the ship must avoid at their peril. This hatch was in a comparatively narrow passage-way, along the side of the ship. To leave it open in a covered passage-way, which was perfectly dark, I must hold negligence in respect to the libelant, whose duties called him there."

In the case before the court, the hatch in question was in a passage-way along the side of the ship and was left open by the ship whose duty it was to prepare a safe place to work in and a safe passage thereto, and although the passage-way was not perfectly dark, yet it was so dark that one coming in from the light could not see without waiting to become accustomed to the comparative darkness. The libelant was lawfully on board; he went down to the lower deck by the obvious entrance thereto, there being no evidence that it was the wrong entrance or that there was any other to be used by the stevedores on that occasion. Although one entering "into a contract of hiring assumes all the risks and hazards ordinarily incident to the employment, and liable to arise from the defects which are patent and obvious to a person of his experience and understanding, it is equally true that risks arising out of the negligence of the master are not those ordinarily incident to the employment and are not, therefore, assumed by the servant." *Bunker Hill, etc., Co. v. Jones,* 130 Fed. Rep. 813, 818-819. When one "expressly or by implication, invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit." *Cooley on Torts,* 605; *Brezee v. Powers,* 80 Mich. 172, 177.

"It is well settled that the owners of a ship are liable for injuries to persons not notified nor warned, and who are lawfully aboard the ship, when such injuries are caused by, or directly result through, negligence in the construction of the ship, the lack of safe appliances, or from the failure to take reasonable precautions for the safety of such persons." *West India, etc., Co. v. Weibel,* 113 Fed. Rep. 169, 171; *The Thyra,* 114 Id. 978.

There is some conflict in the decisions; for instance in the last mentioned case the court says, "The rule is well established that a vessel in charge of charterers, stevedores, or other contractors is not liable to the employes of such persons for injuries, unless the vessel has relation by contract to the injured person, or owes him a duty arising out of the fact that it is being navigated." From my reading of the authorities the rule recognizes the liability to stevedores and their employes but not to charterers and their employes, and only to stevedores when the condition which causes the accident is due to the neglect of the ship and not of the stevedores themselves. The same case I think approaches the above rule in applying the rule of liability "to all cases where the injured person is engaged in some work that requires his presence where he is at the time, and the injury results from the neglect of some maritime duty on the part of the officers or crew, such as a duty necessary to be performed to enable the ship to receive her cargo."

Counsel for libellee contends that libelant received the injury complained of by his own negligence or, if not wholly by his own negligence, it was due in part to that, from the fact that he, having worked on the ship before, was acquainted with the fact and the location of the trimming hatches and was thereby warned that they were there and should have exercised precautions in regard to them.

Although he had undoubtedly the right to expect that the master had used due care and precaution to protect the employes from danger, and to take it for granted that the hatch in question would be closed, yet I recognize some force in the contention of libellee's counsel, particularly under the authority of *The Gladiolus,* supra, cited by him, in which the injured man was held negligent in entering between decks where an open hatch was located, without a light, if a light was necessary. The libelant testified that he was told that the ship was to go to sea at three o'clock on the day of the accident, and as generally everything is made fast and tight when ships go to

sea, he never dreamt that the holes would be open. Also that one of the ship's officers told him to go down below and work and so he took it for granted that everything was all right below. His information about the ship's going to sea that day is not connected with the ship's officers or agents; nor is it clear that the person who told him to go below had any authority or represented the ship; but he, anxious to begin work, hastened below without waiting for the orders or instructions of his foreman. I do not attach any value to the foreman's testimony that he told the men to wait until he got a light, as their testimony is that they did not hear any such remark, but it was not required of him to lead the way to the hold; yet the libelant's hastening through the dark passage without waiting for his eyes to become used to the light, though negligence in him was only contributory negligence, the negligence of the master in leaving the hatch uncovered, a veritable man trap, without lighting the passage or notifying libelant of the uncovered hatch, being the main cause of the accident.

The ship is liable in damages, but in consequence of the contributory negligence on the part of the libelant, the damages may be lessened on account thereof. As to the damages, the testimony shows that at the time of the taking of the testimony, libelant had been two months and four days laid up at the hospital; that for the first four weeks he was under an extension operation with his leg in plaster of Paris; after that his leg was in splints; and that he had suffered intense pain with sleeplessness during the greater part of this period; that he would not be well enough to work again for three or four months. I will take the longer time stated, four months, which I think is rather earlier than he will be able to work in the same condition as he was in before the accident. This makes a loss of wages for six months and four days. His wages were averaged according to his own statement at $40 a month, making a loss of wages of $245.33. There is no evidence as to the expense of the surgical treatment. As to his damages for the suffering, mental and physical, he went through, I feel that

$1,000 is a reasonable estimate,—certainly no one would be willing to go through such suffering and distress for $1,000,—making a total of $1,245.33. Deducting one-third of this amount on account of libelant's contributory negligence we arrive at the sum of $830.22.

I will sign a decree in favor of libelant for $830 and costs.